UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**UNITED STATES OF AMERICA**

v.  CRIMINAL ACTION NO. 2:11-00142-01

**SARGIS TADEVOSYAN**

### MEMORANDUM OPINION AND ORDER

Pending is the Motion of the Defendant to Suppress Evidence Derived From Constitutionally Invalid Search Warrant, filed October 5, 2011, wherein the defendant seeks to suppress "all physical items, observations, other information, proximate leads and any fruits therefrom resulting from a search of an Audi A8," on May 12, 2011, pursuant to a search and seizure warrant issued by United States Magistrate Judge Cheryl A. Eifert.

I.

At the evidentiary hearing on the motion on October 13, 2011, the defendant agreed that he seeks suppression only of the photographs seized from the Audi, scans of which were received in evidence as Government Exhibit Nos. 4 through 13.

The court also received the following two-paragraph stipulation of facts by the parties which the court adopts, to the extent set forth below, as part of its findings of fact.

In the fall of 2010, co-defendants Arsen Bedzhanyan and Igor Shevchuk agreed with an individual known to them as "Garik" to open up several bank accounts using false identification documents that contained Bedzhanyan's and Shevchuk's photo but the names of other people. Shevchuk and Bedzhanyan agreed to provide their photos to "Garik" to create the false identification documents. In exchange for opening these accounts, Bedzhanyan and Shevchuk each received $5,000.00 dollars. In mid-December 2010, Bedzhanyan and Shevchuk traveled to Charleston, West Virginia, with "Garik" and did in fact use false identification documents to open accounts at several banks.

In the beginning of May 2011, "Garik" entered into another agreement with Shevchuk and Bedzhanyan; in exchange for $400.00 each, they would travel to West Virginia again to sign documents in a bank to fix a problem with one of the accounts they opened in December [per footnote 1: There was a problem with the account in the name of KB Support Group, Inc. opened in United Bank, Dunbar, West Virginia]. On or about midnight, May

2

5, 2011, Tadevosyan picked up Shevchuk and Bedzhanyan in Brooklyn, New York, for their trip to West Virginia. At approximately 2:08 p.m. on May 6, 2011, Tadevosyan drove by the United Bank and Shevchuk and Bedzhanyan exited the vehicle. Shortly thereafter, Shevchuk, Bedzhanyan and Tadevosyan were arrested and charged with Health Care Fraud in violation of 18 U.S.C. § 1347, Conspiracy in violation of 18 U.S.C. § 371 and Aiding and Abetting in violation of 18 U.S.C. § 2.

The court, by a preponderance of the evidence, makes the further findings of fact that follow.

The health care fraud charged in the indictment was designed to defraud the Medicare program by establishing five false front locations in the Charleston area and five local bank accounts in the name of the false front providers and then bill Medicare for fictitious claims, with the Medicare payments being funneled through the bank accounts and into the hands of unnamed co-conspirators.

The purpose of the May 6th visit to United Bank was to adjust the account in order to allow the use of electronic wire transfers. By that time, the authorities had been alerted to the fraudulent scheme, designed as it was to defraud the

Medicare program initially of some $4 million. Consequently, the visit to United Bank was conducted under surveillance by the following: Scott Cruickshank, Special Agent of the Department of Health and Human Services, Office of Inspector General ("HHS-OIG"); Scott Noulett, Special Agent with HHS-OIG; and Seth Summers, Special Agent with the United States Secret Service. The three of them also effected the arrest of all three of the named defendants shortly after the visit of Bedzhanyan and Shevchuk to United Bank on May 6, 2011. Tadevosyan had dropped the other two off near the bank and drove to a McDonalds a block or so away where they all met after the bank visit. From there the three traveled in the Audi to a car dealership when they were all apprehended.

The Audi was sealed, impounded and stored until the search of the vehicle pursuant to the search warrant six days later. The search was conducted by the same three agents who arrested the three defendants, together with Special Agent Mary Withrow of HHS-OIG and Trooper LaFaucia of the West Virginia State Police.

By the time of the search at least Agents Cruickshank, Noulette and Summers were familiar with defendant Tadevosyan whom they had arrested. They also had in hand a still

4

photograph, taken from a landlord's surveillance video, of an individual who had accompanied Konstantin Kalaydzhiev ("KK") when KK leased each of the five false front locations. The false front locations included one at 815 Quarrier Street and one at 231 Capitol Street in Charleston. A maintenance lady who serviced both locations identified the individual pictured in the still photograph a large white Russian male who had been present with KK. That same individual, name unknown, was also identified as one who in April of 2011 was seen coming in and out of a false front provider location.

In addition, at the request of Agent Noulett, Agent Summers had obtained a record copy of the New York driver's license of another individual who the maintenance lady had described as operating a black Mercedes SUV, bearing a New York license plate number which she remembered, that seemed to be associated with the office space at 815 Quarrier Street. The copy of the New York driver's license was obtained by Agent Summers on May 3, 2011, and reflected the name and picture of Ara Ohanyan.

On May 12, 2011, six days after the arrest of Shevchuk, Bedzhanyan and the defendant the search and seizure

warrant was executed. The search warrant sought, <u>inter</u> <u>alia</u>, the following:

1. All records relating to the ownership, registration, and insurance of the automobile.

2. All personal and business financial records.

3. All mail and other correspondence, opened and unopened, including, but not limited to, United States Postal Service mail and mail sent through common carriers such as Federal Express and UPS, including the authority to open and seized unopened mail.

4. Authority to lift latent fingerprints inside the automobile.

5. Authority to take photographs of the interior of the automobile.

6. Personal identification documents such as driver's license, passports, and immigration documents.

7. Cellular telephone and related devices . . .

8. GPS device . . .

The search began with removal of the evidence tape that had sealed the Audi, followed by the taking of a series of photographs of the exterior and interior of the Audi. The officers were then assigned different areas to search. Agent Summers was assigned the rear seat portion where he observed a bulge in the pocket on the rear side of the driver's seat. He pulled from the pocket a pack or group of nine 8½ inch by 10½ inch slick cardboard folders. Each, when opened, is seen to be

designed to hold a photograph.  Each folder contained an 8 inch by 10 inch photograph that slipped into a 1 inch cardboard frame that held it in place.  These items were introduced at the motion to suppress hearing as Government Exhibits 4 through 13, except that Exhibit 10 is a smaller 6 x 8 photograph that appears to have been loosely inserted into Exhibit 11.

Exhibits 4, 5 and 6 contain a copy of the same photo.  Exhibits 11, 12 and 13 also contain a copy of the same photo but different from that contained in Exhibits 4, 5 and 6.  Exhibits 7, 8 and 9 each contained a photograph different from all of the others.

Agent Summers laid the folders on the rear seat, opened them and immediately identified the individual in Exhibit 8, Ara Ohanyan, as the individual whose photograph he had just received three days earlier on the copy of the New York driver's license.  Seated next to him in the photograph is the defendant Tadevosyan.  Agent Summers also saw the image of the individual in the still photograph who was pictured along with the defendant and three others in the photograph appearing in Exhibits 4, 5 and 6.  That same individual shown in the still photograph appears in Exhibit 7.  The defendant appears in the photograph in Exhibit 9.  All of the photographs appear to have

7

been taken in a restaurant setting. When Agent Withrow completed the property receipt on the day of the search, she listed the folders and photographs simply as "family photos," thinking of them as being akin to cruise ship photographs.

Apart from the immediate recognition by Agent Summers of first Mr. Ohanyan and the defendant in the Exhibit 8 photograph in which both appeared, then of the image of the man in the still photograph described as the large white Russian who is pictured in Exhibits 4, 5 and 6 with the defendant, Agent Cruickshank testified that he thought the photographs would fall under the category of "personal identification documents" specified in the search warrant.

## II.

A.   Plain-View Doctrine

Our court of appeals has observed that "'the plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent.'" <u>United States</u>

v. Green, 599 F.3d 360, 376 (4th Cir. 2010)(quoting United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing Horton v. California, 496 U.S. 128, 136-37 (1990)); United States v. Williams, 41 F.3d 192, 196 (4th Cir. 1994).

In this instance, the agents and law enforcement were lawfully in the process of executing a search warrant on the Audi during its impoundment. They also had a lawful right of access to folders and the pictures found within them. The folders were reasonably thought to contain items authorized for seizure by the magistrate judge, including records relating to the ownership, registration, and insurance of the vehicle or other records for which the search was authorized.

Respecting the third requirement, the incriminating nature of some of the photographs was apparent at first blush to Agent Summers. He immediately recognized Mr. Ohanyan and the defendant in Exhibit 8. The same is true of the image of the man in the still photograph described as the large white Russian who is pictured in Exhibits 4, 5 and 6 with the defendant. The photographs tend to link defendant with the criminal activity alleged in the indictment inasmuch as the two individuals appearing with defendant were known to have visited the false front locations. Inasmuch further as Exhibits 7 and 9 depict

9

separately defendant and one of the aforementioned individuals, they would fall within the plain-view exception as well.

The court, accordingly, concludes that suppression is inappropriate respecting Government Exhibit Nos. 4, 5, 6, 7, 8 and 9. Inasmuch as it has not been demonstrated that Exhibit Nos. 10, 11, 12 and 13 were lawfully seized, those Exhibits are subject to suppression.

B.  Good-Faith Exception

Moreover, the search and seizure of Exhibits 4, 5, 6, 7, 8, and 9, warrants consideration under the good-faith exception. In <u>United States v. Leon</u>, 468 U.S. 897 (1984), the Supreme Court stated that "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" <u>United States v. Williams</u>, 548 F.3d 311, 317 (4th Cir. 2008) (quoting <u>United States v. Bynum</u>, 293 F.3d 192, 195 (4th Cir. 2002) (quoting <u>Leon</u>, 468 U.S. at 922 n.23)).

The decision in <u>Leon</u> additionally provides "that the deterrence purpose of the exclusionary rule is not achieved

through the suppression of evidence obtained by 'an officer acting with objective good faith' within the scope of a search warrant issued by a magistrate." <u>United States v. Perez</u>, 393 F.3d 457, 461 (4th Cir. 2004) (quoting <u>Leon</u>, 468 U.S. at 920. The rule is that "evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'" <u>Id.</u> (quoting Leon, 468 U.S. at 922).

The good-faith exception, however, does not apply under the following circumstances:

> First, where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth,";
>
> Second, where "the magistrate acted as a rubber stamp for the officers and so 'wholly abandoned' his detached and neutral 'judicial role,'";
>
> Third, where a supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,"; and
>
> Fourth, where "a warrant [is] so facially deficient— <u>i.e.</u>, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid[.]"

<u>Williams</u>, 548 F.3d at 317.

Agent Cruickshank testified that he thought the photographs would fall under the category of "personal identification documents" specified in the search warrant. That belief, while perhaps mistaken, is the type of law-enforcement determination indicative of the exercise of objective good faith within the scope of a search warrant issued by a magistrate judge. One would not automatically expect a reasonably well trained officer to have concluded otherwise. Neither are any of the four exceptions to the good-faith requirement applicable here.

The court concludes in the alternative that, at least as to Government Exhibit Nos. 4, 5, 6, 7, 8 and 9, which the court has previously found to have been admissible pursuant to the plain-view doctrine, suppression is inappropriate. The court, accordingly, denies the motion to suppress with respect to Government Exhibit Nos. 4, 5, 6, 7, 8 and 9 and grants the motion as to Exhibit Nos. 10, 11, 12 and 13.

The Clerk is directed to send a copy of this memorandum opinion and order to the defendant and all counsel of record.

DATED: November 2, 2011

_____
John T. Copenhaver, Jr.
United States District Judge